UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Civil Case No. _____ |
| | ) | |
| APPROXIMATELY TWENTY-THREE | ) | |
| PIT BULL-TYPE DOGS SEIZED | ) | |
| FROM 3310 NORTH STREET | ) | |
| WAYCROSS, GEORGIA, | ) | |
| | ) | |
| **Defendants.** | ) | |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW the United States of America, by and through David H. Estes, United States Attorney for the Southern District of Georgia, and the undersigned Assistant United States Attorney, and brings this Verified Complaint for Civil Forfeiture *in Rem*, with the following allegations:

### NATURE OF THE ACTION AND BASIS FOR FORFEITURE

1.      This is a civil action *in rem* for the forfeiture of twenty-three pit bull-type dogs (hereinafter, "Defendant Dogs") that were involved in a violation of the animal fighting venture prohibition section of the Animal Welfare Act, 7 U.S.C. § 2156.

### THE DEFENDANTS *IN REM*

2.      The defendants *in rem* are approximately twenty-three pit bull-type dogs seized on or about March 11, 2021, from Ware County Animal Shelter located at 3030 Brown Drive in Waycross, Georgia, pursuant to a federal warrant to seize property subject to forfeiture. The Defendant Dogs were originally seized on or about March 9, 2021, from 3310 North Street Waycross, Georgia.

3.      The Defendant Dogs are pit bull-type dogs described as follows:

     i.    USM-613: a very thin brown and white male,

    ii.    USM-614: a thin black and white male,

   iii.    USM-615: a thin brown and white male,

   iv.    USM-616: a tan and white female,

    v.    USM-617: a thin tan and white female,

   vi.    USM-618: a tan and white female,

  vii.    USM-619: a tan and white female,

 viii.    USM-620: a thin brown and white female,

   ix.    USM-621: a very thin tan male,

    x.    USM-622: a thin brown male,

   xi.    USM-623: a tan and white male,

  xii.    USM-624: a very thin brown with white male,

 xiii.    USM-625: an emaciated black and white female,

 xiv.    USM-626: an emaciated tan and white female,

  xv.    USM-627: a very thin brown female,

 xvi.    USM-628: an emaciated red female,

 xvii.    USM-629: a very thin black and white female,

xviii.    USM-630: a brown male,

 xix.    USM-631: a thin tan and white female,

  xx.    USM-632: a black and white female,

 xxi.    USM-633: a red and white male,

 xxii.    USM-634: a red and white male, and

xxiii.    USM-635: a black and white male.

4.    The Defendant Dogs were seized by the U.S. Marshals Service and are being cared for by a contractor who is providing the dogs with access to veterinary and rehabilitation services.

5.    The Defendant Dogs are subject to forfeiture to the United States pursuant to 7 U.S.C. § 2156(e), as animals involved in a violation of the federal animal fighting venture prohibition codified at 7 U.S.C. § 2156.

6.    Because this Complaint is being filed for the purpose of establishing grounds for forfeiture and providing notice to interested persons, it does not include all of the information known by the Government in connection with the investigation underlying the claims for forfeiture set forth herein.

## JURISDICTION AND VENUE

7.    Plaintiff, the United States of America, brings this *in rem* action in its own right and pursuant to its authority to forfeit the Defendant Dogs.  Pursuant to 28 U.S.C. § 1345, this Court has jurisdiction over an action commenced by the United States.  Additionally, pursuant to 28 U.S.C. § 1355(a), this Court has jurisdiction over any action or proceeding for forfeiture.

8.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b) and 1395 because the acts and omissions giving rise to forfeiture occurred in this district and because the Defendant Dogs were found in this district.

## BASIS FOR FORFEITURE

9.    The federal Animal Welfare Act, 7 U.S.C. § 2131, *et seq*., defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment."  7 U.S.C. § 2156(f)(1).  It is illegal to sponsor or exhibit an animal in an animal

fighting venture.  7 U.S.C. § 2156(a)(1).  It is also illegal to sell, buy, possess, train, transport, deliver, or receive an animal intended for use in an animal fighting venture.  7 U.S.C. § 2156(b).

10.     The Animal Welfare Act provides that "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located."  7 U.S.C. § 2156(e). Animals "seized under such a warrant shall be held by the United States Marshal or other authorized person pending disposition thereof by the court in accordance with this subsection." *Id.*  In addition, "[n]ecessary care including veterinary treatment shall be provided while the animals are so held in custody."  *Id.*

11.     The statute also contemplates forfeiture of the seized animals. Specifically,

[a]ny animal involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States at any time on complaint filed in any United States district court or other court of the United States for any jurisdiction in which the animal is found and upon a judgment of forfeiture shall be disposed of by sale for lawful purposes or by other humane means, as the court may direct.

*Id.* The costs incurred in caring for animals seized and forfeited under this section "shall be recoverable from the owner of the animals (1) if he appears in such forfeiture proceeding, or (2) in a separate civil action brought in the jurisdiction in which the owner is found, or transacts business." *Id.*

12.     As explained below, the Defendant Dogs are animals "involved in violation[s]" of 7 U.S.C. § 2156, and are therefore subject to forfeiture pursuant to 7 U.S.C. § 2156.

## BACKGROUND

13.      Dog fighting is a violent contest in which two dogs that are bred and conditioned for fighting are released by their owners or handlers in a controlled environment to attack each

other and fight for purposes of entertainment or gambling.  Fights usually end when one dog

withdraws, when a handler "picks up" his dog and forfeits the match, or when one or both dogs

die.

14.     Pit bull-type dogs are the most prevalent type of dogs used in dog fighting ventures.

This is due to their short coat, compact muscular build, and the aggressive temperament that some

exhibit toward other dogs.

15.     Dog fighters select the strongest, most capable fighting dogs and selectively breed,

sell, and fight those dogs that display particular traits.

16.     Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight

other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal

injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through

fatigue and injury.

17.     Dog fighters fight dogs with a goal of obtaining "Champion" or "Grand Champion"

status for their dogs, which is achieved by winning three or five fights, respectively.

18.     Dog fighters can generate substantial income from gambling on dog fights and from

the sale and breeding of animals with a fighting lineage.

19.     It is a common practice for those involved in training and exhibiting fighting dogs

to possess several dogs at one time.  This practice is followed for several reasons.  Dog fighters

maintain a stock of dogs at different weights and both sexes because in dog fights, dogs are

matched against other dogs to within a pound of the same weight against dogs of the same sex.

Maintaining a stock of several dogs thus increases the odds of owning a dog whose weight meets

the requirements for a match being solicited by an opponent.

20.     Further, dog fighters must possess an inventory of dogs because dogs often die or are badly injured during fights.  Dogs that lose fights or fail to show "gameness" are often killed. It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment.

21.     Dog fighters also maintain multiple dogs in order to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dog fighting bloodline. Possessing multiple dogs increases the prospects of owning a dog who will become a Champion or Grand Champion.  Dog fighters also routinely test and evaluate their dogs to determine those that exhibit aggressive behavior, including against their own dogs.

22.     Dog fighters typically do not start setting up matches for a dog until the dog reaches at least eighteen months to two years of age. Until then, dog fighters may test the dog out by "rolling" it or having the dog participate in short fights to assess the dog's demeanor. Thus, it is common for dog fighters to possess young dogs who are in the process of being trained to fight and, thus, do not yet have much, if any, scarring.

23.     One sign of dog fighting is the presence of pit bull-type dogs on heavy or excessive chains, or housed individually in pens or crates.  Persons engaged in dog fighting take steps to restrain or isolate dogs used for fighting from one another to prevent them from fighting at unintended times.  They may also keep younger dogs they intend to use for fighting out of reach of other dogs to discourage normal socialization. Heavy chains are used to develop neck strength in dogs used for fighting.

24.     Dogs who have been fought may have scars, puncture wounds, swollen faces, or mangled ears.  Scars from organized dog fights are commonly found on the face and front legs, as

well as on hind ends and thighs.  The majority of the adult Defendant Dogs had scarring and or wounds.

## **FACTS**

25.     On March 9, 2021, United States Marshals, along with Ware County Sheriff's Officers, a Georgia Department of Corrections K9 Officer, and Georgia Department of Community Supervision Officers, traveled to 3310 North Street, Waycross, Georgia to serve a murder warrant on Kendrick Mizell.  U.S. Marshals had previously learned that Mizell was hiding at 3310 North Street, Waycross, Georgia, the residence of Monterio O'Hara and that Monterio was currently on felony probation, for which a Fourth Amendment search waiver was a condition.

26.     As law enforcement approached the Waycross residence, they observed Andre O'Hara running from the backyard into the woods.  A Georgia K9 Officer tracked down Andre, took Andre into custody, and returned him to the residence.

27.     Soon after law enforcement arrived at the Waycross residence, Georgia Detectives observed Monterio O'Hara leave his place of employment, Live Oak Homes, and begin traveling towards 3310 North Street.  After observing traffic violations, the detectives conducted a traffic stop of Monterio's vehicle.  After issuing a warning and concluding the traffic stop, the detectives informed Monterio that U. S. Marshals would like to speak with him and, if he was willing to do so, Monterio could remain at the location of the traffic stop.  Monterio agreed to speak with and wait for the Marshals at the traffic stop location.

28.     When asked, Monterio denied knowing the whereabouts of Mizell.  Within minutes after Monterio's statement, the Marshals received word that Mizell had exited the Waycross residence after he had been ordered to do so over the P.A. system.  Thereafter, law enforcement placed Monterio into a Ware County patrol vehicle and drove him to the 3310 North Street.

29.    At the Waycross residence, in response to her question, Monterio told Officer Tasha Roberts that he was living at 3310 North Street, and that his bedroom was to the right after entering the front door.  Officer Roberts advised Monterio that a Fourth Amendment probation search would be conducted of the residence.  During a search of Monterio's residence, law enforcement found, among other contraband, twenty-three pit bull type dogs and items consistent with training and conditioning dogs to fight.

30.    When asked, Andre O'Hara claimed ownership of all twenty-three dogs.  When arrested, Andre O'Hara had $3,649 in cash on him which he claimed was from a recent sale of a dog.

31.    All three individuals–Kendrick Mizell, Andre O'Hara, and Monterio O'Hara were arrested.

32.    Upon discovering the dogs, law enforcement requested that Ware County Animal Services respond to 3310 North Street, Waycross, Georgia.  The Defendant Dogs were not in a condition consistent with that of pet dogs.  Animal control officers seized the twenty-three pit bull type dogs.

33.    Animal control officers walked to where the dogs were located in the rear yard of the property.  In this part of the property, some of the adult Defendant Dogs were separated and kept on heavy chains.  One dog weighing 31.3 pounds had a chain weighing 20.9 pounds, approximately two-thirds his weight.  Other adult Defendant Dogs were kept in above-ground kennels separated in such a way so that they could not physically interact with each other.  *See, e.g.,* photos below.

 

 

34.     The Defendant Dogs appeared to be permanently housed outside.

35.     None of the Defendant Dogs appeared to have food or water in the area they were

segregated in. Thirteen of the Defendant Dogs were underweight and emaciated. *See, e.g.,* photo

below. Officers observed 50-pound bags of food in several locations in the rear of the property.



36.     The following dogs had substantial scarring to their faces, necks, and bodies that are consistent with bite marks:  USM-613, USM-620, USM-621, USM-622, USM-625, USM-630, USM-631 and USM-633.  Two of the Defendant Dogs were so aggressive that the animal control officers had to remove them with a control pole.  One dog had scarring that appeared to be less than one week old.  *See e.g.,* photos below.





37.     Six of the Defendant Dogs had pressure sores. One female dog was severely dehydrated and had to be given electrolytes.  Another female had no teeth due to her teeth being broken or chewed down to the gum line.

38.     Fifteen of the Defendant Dogs tested positive for hookworm.

39.     Ware County Animal Services conducted intake exams of the Defendant Dogs and determined that the dogs were in poor shape, and showing signs of severe neglect.

40.    In addition to the dogs, animal control officers seized the following items that are typically used by individuals involved in dog fighting for the purpose of training dogs to become fight dogs:

    a. Treadmill – this treadmill was kept in an open air carport that also contained dog food and miscellaneous medications for animals.  It is common for dog fighters to use treadmills to force dogs to exercise.  The treadmill had holes drilled in the top handle.    The drilled holes would be used to affix a chain or a rope to the collar of the dog and when the treadmill is turned on, the dog would be forced to walk or run at the set pace of the treadmill.  *See* picture below.



    b. Jenny Mill –a Jenny mill is used to build stamina in fighting dogs. This item has a central pole with a swivel pole across the top.  The top pole has a cinder block (to add weight) and some type of enticement such as a toy or piece of

raw hide. The other side of the pole has a cable that is affixed to the collar of the dog. The dog runs in a circle attempting to "catch" the enticement. This particular Jenny mill was located in the middle of some dog pens and had a worn circular pattern consistent with recent use. *See* picture below.



c. Water Treader – This is a portable water tank (approximately 400 gallons) that has a four by four post affixed to each side and one four by four post affixed across the top. The top post has a hook that is screwed into the bottom of the post and is in the middle of the tank. The tank was empty of water. In the bottom of the tank was a chain with a hook. This is consistent with known methods dog fighters use to exercise fighting dogs. The water tank is filled with water that is deeper than the dog is tall, and the dog is chained to the post and forced to swim. *See* picture below.



d. Flirt Pole – This is used by dog fighters to train dogs to defend themselves against side attacks.  The pole is waived above the dogs' head from side to side which enhances the dogs' ability to utilize his peripheral vision.  The flirt pole was located on the back porch.  *See* picture below.



e. Spring Pole – This is a rope with an enticement that is usually affixed to a spring and/or tied to a low tree limb or stable object.  This is used by dog fighters to strengthen the jaw muscles of the dogs.  The dog jumps upward to grab and pull on the enticement.  The rope is affixed in a manner that when the dog jumps up to grab the enticement, the feet of the dog are just off the ground forcing the dog to hold onto the enticement while supporting his

weight. A rope was found affixed above the pen on one young dog. *See* picture below.



    f. Weighted device – On the back porch, agents found a collar attached to a chain that had a 20 pound kettle bell affixed to the other end of the chain. This is used by dog fighters to strengthen the dog as the collar is affixed to the dog and the dog is forced to pull the kettle bell along the ground.



    g. Pedigrees – Agents seized one pedigree and three registration papers. Pedigrees are used to show the bloodline of dogs. This value of dogs

increases if they are bred from certain bloodlines of Champions or Grand Champions.



h. Medications – Agents seized injectable antibiotics, syringes, deworming medication, and Rooster Booster Liquid B-12 made for poultry, among other medical supplies.[1]   A drawer filled with animal medications was located in a dresser on the back porch, as well as additional medical supplies located in the outbuilding where the treadmill and dog food was located.  Dog fighters typically keep such medications because they are hesitant to take their dogs to a licensed veterinarian for fear of being reported.  *See* photos below.

---

[1] Dog fighters use medications and supplements intended for farm animals because prescriptions are not required to obtain such products.



i.  Concealment – Agents noted that there was a chain linked fence, with plastic slats weaving, that surrounded the rear of the property where the dogs were found. This is common as dog fighters tend to take measures to shield their dogs and training equipment from public view.  *See* pictures below.





35.     On March 11, 2021, on the Government's application, Magistrate Judge Benjamin

W. Cheesbro issued a federal warrant to seize the Defendant Dogs at the time located at the Ware

County Animal Shelter.

### CLAIMS FOR RELIEF

<u>FIRST CLAIM FOR RELIEF</u>

41.     The United States incorporates by reference the allegations set forth in Paragraphs

1-35 above as if fully set forth herein.

42.     The Defendant Dogs constitute animals involved in violations of 7 U.S.C. §

2156(a)(1).

43.     The Defendant Dogs are therefore subject to forfeiture, pursuant to 7 U.S.C. § 2156.

<u>SECOND CLAIM FOR RELIEF</u>

44.     The United States incorporates by reference the allegations set forth in Paragraphs

1-35 above as if fully set forth herein.

45.     The Defendant Dogs constitute animals involved in violations of 7 U.S.C. §

2156(b).

46.   The Defendant Dogs are therefore subject to forfeiture, pursuant to 7 U.S.C. § 2156.

WHEREFORE, the United States of America prays that process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the Defendants *in rem*; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the Defendants *in rem* be forfeited to the United States of America for disposition according to law; that the Court enter a judgment for costs associated with the care of the Defendants *in rem* pursuant to 7 U.S.C. § 2156(e) should any interested party file a claim for the Defendants *in rem*; and that the United States of America be granted such other relief as this Court may deem just and proper.

This 29th day of September, 2022.

Respectfully submitted,

DAVID H. ESTES
UNITED STATES ATTORNEY

*s/Shannon H. Statkus*
Shannon H. Statkus
Assistant United States Attorney
South Carolina Bar No.  70410
P.O. Box 2017
Augusta, GA  30903
(706) 724-0517
Shannon.statkus@usdoj.gov

## **VERIFICATION OF COMPLAINT FOR FORFEITURE *IN REM***

I, Special Agent Douglas Bridges, with the United States Department of Agriculture, Office of Inspector General, have read the foregoing Complaint for Forfeiture *in Rem* in this action and state that its contents are true and correct to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This  29th day of September, 2022.


_____
*Douglas D. Bridges*
DOUGLAS BRIDGES
SPECIAL AGENT
UNITED STATES DEPT. OF AGRICULTURE,
OFFICE OF INSPECTOR GENERAL